32 So.3d 750 (2010)
D.M.G., n/k/a D.M.M., Appellant,
v.
G.E.M., Appellee.
No. 2D09-2899.
District Court of Appeal of Florida, Second District.
April 23, 2010.
Allison D. Thompson of The Orsini and Rose Law Firm, Tampa, for Appellant.
Dominic J. Baccarella of Baccarella & Baccarella, P.A., Tampa, for Appellee.
WALLACE, Judge.
D.M.M. (the Mother) appeals the circuit court's order confirming the report of a general magistrate (GM) and changing the primary residential custody of the parties' minor child, C.E.M., from the Mother to G.E.M. (the Father). Because the Father failed to prove a substantial and material change in circumstances necessary to warrant a modification of the prior judgment *751 awarding primary residential custody to the Mother, we reverse the circuit court's order and remand for further proceedings.

I. THE FACTS AND PROCEDURAL HISTORY
The Mother and the Father never married. They each have a modest income and very limited assets. After the Mother became pregnant with C.E.M., she and her older daughter, M.G., began living with the Father at his mother's home. After C.E.M. was born in 2001, the Mother lived with the Father and his mother for approximately eleven months. She then moved out and lived on her own with C.E.M. and M.G. In September 2002, the Father filed a petition to determine paternity with the circuit court. He requested shared parental responsibility, primary residential custody of C.E.M., and child support. The Mother filed a counterpetition requesting shared parental responsibility, primary residential custody, and child support.
In the paternity proceeding, the Father made multiple allegations about the Mother's fitness to have primary residential custody of C.E.M., including (1) her history of evictions; (2) her lack of stable employment; and (3) the removal of the Mother's oldest child from her and her former husband, C.G., because of the former husband's alleged physical abuse of the child and the Mother's failure to protect the child from harm. Despite the Father's claims about the Mother's unfitness, the circuit court entered a final judgment of paternity in April 2003, granting shared parental responsibility to the parties and awarding primary residential custody to the Mother. The circuit court also ordered the Father to pay child support.
In February 2007, approximately four years after the entry of the final judgment of paternity, the Mother filed a pro se supplemental petition to modify custody. This petition started the events that led to the entry of the order under review. In her pro se petition, the Mother alleged that she had remarried in February 2006 and wished to relocate with C.E.M. and her new husband to Oklahoma. She also asked the circuit court to review the child support award because the Father was no longer in school and was working full-time. Later, the Mother filed an amended supplemental petition for modification through counsel. In her amended petition, the Mother reiterated her request to relocate to Oklahoma. She also requested an increase in child support, payment of child support arrearages, the entry of an income deduction order, and a reasonable visitation schedule for the Father.
The Father filed an answer and counterpetition to modify custody through counsel. He alleged that a substantial change of circumstances had occurred when the Mother remarried and decided to relocate to Oklahoma. The Father asserted that the Mother's relocation with C.E.M. would have a significant impact on his relationship with the child. The Father requested (1) that he be awarded primary residential custody of C.E.M. and child support from the Mother and (2) that the Mother be awarded frequent and liberal visitation.
After the parties filed their initial pleadings, the circuit court ordered a social investigation and study report. In February 2008, the court-appointed investigator filed a report based upon her investigation of the issues of visitation, modification of primary residency, and relocation. The report includes an analysis of the child's best interest that correlates with the factors set forth at section 61.13(3), Florida Statutes (2006). With respect to the factor listed at section 61.13(3)(f), "[t]he moral fitness of the parents," the investigator stated:

*752 There has been no supported evidence that [the Father] or [the Mother] is morally unfit. However, [the Mother] seems to have a pattern of partnering with men who engage in unlawful and questionable activity. [The Mother's] current husband, [D.M.,] was incarcerated in the State of Oklahoma on substance abuse related charges and also admittedly abused substances. This information was disclosed while discussing involvement with counseling. In addition, [the Mother's] first husband, [C.G.], allegedly physically abused her oldest daughter. This information has not been corroborated through official legal documents from Oklahoma. Seemingly, [the Mother] exhibits a tendency to associate with others who have questionable backgrounds and behavior.
Thus, while conceding the absence of evidence of the Mother's unfitness, the investigator questioned her judgment in the selection of male partners.
In addition, the investigator's report echoed charges made by the Father that the Mother had exhibited "employment and residential instability" since leaving the home that he shared with his mother. The investigator expressed concern that the Mother's relocation to Oklahoma with the child "would [have] a significant impact on the parent/child bond between [C.E.M.] and [the F]ather due to disruption and infrequency of contact." Viewing the issues before her through the prism of the Mother's planned relocation to Oklahoma with her current husband, the investigator recommended "that [the Father] be granted primary residential custody of the minor child, [C.E.M.]"
On July 22, 2008, a significant event in the case occurred: the Mother obtained a dissolution of her marriage to D.M., her then current husband. The Mother filed a second amended supplemental petition for modification the next day. In that petition, she withdrew her request to relocate with C.E.M. to Oklahoma. The Mother also alleged that there had been a substantial change in circumstances requiring modification of child support and other relief, including that the Father was in arrears in the payment of his child support obligation and had recently begun to work full-time. She requested, among other things, an increase in child support and the entry of an income deduction order.
A final hearing was held before the GM in September 2008. At the beginning of the hearing, the Father's counsel noted that since the Mother had filed her petition, she had divorced her husband and no longer planned to relocate to Oklahoma. Counsel also noted that the social study report was completed before the Mother was divorced. Despite these changes in the operative facts in the case, the Father wished to proceed on his petition to modify residential custody.[1]
The Father testified at the hearing that he desired a change in primary residential custody for the following reasons:
I've been a stable parent for [C.E.M.] for pretty much her whole life. I've only had one place I've lived, I've worked at Wal-mart for eight years, longer than she's been alive and [the Mother] has always wanted to move away from Florida and even though *753 right now she thinks she doesn't want to move now, some time down the road she may and I really don't want to have my daughter not have me in her life close to everyday.
Thus the Father's hearing testimony refocused the concern expressed in his counterpetition that the Mother was preparing to move with C.E.M. to Oklahoma on the possibility that the Mother might decide "to move away from Florida" at some undetermined date in the future.
In addition, the Father testified that the Mother was "a good mom" but he claimed that she had made some decisions that were not good for C.E.M., including marrying D.M. one month after he had been released from prison and changing her residence frequently. The Father also admitted that he had stopped paying child support in 2005 and that he was currently working full-time. The Father explained that he had stopped paying support for C.E.M. because he had to pay his student loans and because he was taking care of C.E.M. part-time during the day.
The Mother admitted to a history of six or seven moves since she had left the Father's apartment with C.E.M. and M.G.[2] However, the Mother testified that she was required to move because she was not earning enough money to support herself and the Father was not paying her child support on a regular basis. In other words, she moved in order to find places that she could afford. At the time of the hearing, the Mother was in her second year at her current residence. She planned to stay there for three years and to attempt to purchase a home in 2010.
The GM subsequently filed a report and recommendation on the parties' petitions. In his report, the GM concludedin pertinent partthat there had been a substantial change in circumstances warranting modification of the custodial arrangement based on the following findings:
12. The report from the social study and investigation thoroughly addresses and the testimony and evidence confirmed that the Respondent/Mother has established "a pattern of partnering with men who engage in unlawful and questionable activity" and that those relationship choices have, among other things, resulted in numerous residential and school changes and a lack of continuity and stability for the parties' child. The undersigned concludes that these represent substantial changes in circumstances warranting modification of the custodial arrangement.
Accordingly, the GM recommended that the Father serve as the primary residential parent.
The Mother, who was once again proceeding pro se, filed an objection to the GM's report. She argued that no evidence of a substantial change of circumstances was presented at the hearing. The Mother contended that there was "no pattern of [partnering] with men who engaged in unlawful and questionable activity and no evidence was [submitted] with this pattern." She noted that from the entry of the final judgment of paternity through the final hearing she had only been "in one relationship." The Mother added that "[t]here is no evidence in the record that relation[ship] choices on the part of the [M]other have result[ed in] `numerous residence and school changes.' The child has attended the same school since entering *754 kindergarten."[3]
Upon a review of the GM's recommendation, the record, and the Mother's objection, the circuit court agreed with the Mother andin effectsustained her objection. In March 2009, the circuit court entered an order on the GM's recommendation, rulingin pertinent partas follows:
4. The magistrate concluded that the Mother has established a "pattern of partnering with men who engage in unlawful and questionable activity" and that those relationship choices have, among other things, resulted in numerous residential and school changes and a lack of continuity and stability for the parties' child. The record shows that since the original Final Judgment the Mother has had one relationship other than the Father of the Child. This is not enough to establish "a pattern." Additionally, the magistrate[']s report and recommendation determined that there had been a substantial change based on the fact that the relationships had resulted in numerous residential and school changes and a lack of continuity and [stability] for the parties' child. The record does not show that the residential and school changes were a result of the Mother's relationships. Rather, the record shows that the Mother was forced to move[] based on tough financial circumstances. In fact, the Father neglected to pay the Mother child support for some time. Additionally, the child did not have any unnecessary school changes as a result of the Mother[']s changes in residence. The child was enrolled in a private kindergarten program which did not continue into first grade. Upon entering the first grade, the child has not changed elementary schools.
Based on this ruling, the circuit court concluded that the GM had "misconstrued the legal effect of the evidence as the evidence does not show that a substantial change of circumstances occurred since the entry of the original Final Judgment" and that the GM's report and recommendation should be vacated. In a separate order, the circuit court remanded the case to the GM for further findings of fact, conclusions of law, and recommendations. The circuit court noted that the GM "shall be authorized to conduct, if necessary, further hearings as to this remand and proceeding."
On remand, the GM entered an amended report and recommendation. In the amended report, the GM noted that no further formal hearings were conducted. Despite the circuit court's rejection of the GM's findings and recommendations in the initial report, the amended report repeated those findings and recommendations without substantial change. In a footnote, the GM noted that the initial report had adopted a finding by the court-appointed custody evaluator that C.E.M. had numerous school changes. Upon a review of the record, the GM "acknowledge[d] that the child did not have numerous school changes." Accordingly, the GM deleted that erroneous finding from the amended report.
Once again, the GM found that a modification of custody was in C.E.M.'s best interest and recommended that the final judgment of paternity be modified to award primary residential custody of C.E.M. to the Father and that the parties continue to exercise shared parental responsibility. The GM also recommended that the Mother pay child support to the Father.
On June 9, 2009, the circuit court entered an order approving and ratifying the *755 GM's report and recommendations and changing the primary residential custody of C.E.M. from the Mother to the Father. However, the only significant change in the GM's amended report was the deletion of the erroneous finding concerning "numerous school changes," a change which was favorable to the Mother. In effect, the circuit court approved a change in primary residential custody from the Mother to the Father based on facts that it had previously found insufficient to support such a modification. This appeal by the Mother followed.

II. DISCUSSION
There is a presumption in favor of an original custody determination, and before a court may modify such a judgment, it "must decide whether there is a `factual basis sufficient to show that conditions have become materially altered since the entry of the previous decree.'" Wade v. Hirschman, 903 So.2d 928, 933 (Fla. 2005) (quoting Frazier v. Frazier, 109 Fla. 164, 147 So. 464, 467 (1933)). It then must determine whether "the child's best interests justify changing custody." Id. at 931 n. 2 (quoting Cooper v. Gress, 854 So.2d 262, 265 (Fla. 1st DCA 2003)). But "[t]he preliminary question of a substantial and material change is a prerequisite to considering the best interests of the child under section 61.13(2)(d), Florida Statutes." Mesibov v. Mesibov, 16 So.3d 890, 892 (Fla. 5th DCA 2009). And if "the allegations and evidence are insufficient as a matter of law to satisfy the substantial change test," an order modifying custody must be reversed. Id.
Here the GM's erroneous factual findings and erroneous application of the law with respect to his determination that a substantial change of circumstances had occurred since the entry of the final judgment of paternity were clear on the face of the amended report and recommendations. It follows that the circuit court erred in approving and ratifying the amended report and recommendations. See French v. French, 12 So.3d 278, 280 (Fla. 5th DCA 2009) ("Because the errors in the general magistrate's findings of fact as to expenses were clear on the face of its report, the trial court erred in confirming the report."). The circuit court had already reviewed the record in response to the Mother's exceptions to the GM's original report and recommendations and had concluded that the GM's factual finding that the Mother had established "a pattern of partnering with men who engage in unlawful and questionable activity" was not supported by competent, substantial evidence in the record. Furthermore, the circuit court had concluded that "[t]he record does not show that the residential and school changes were a result of the Mother's relationships. Rather, the record shows that the Mother was forced to move[] based on tough financial circumstances. In fact, the Father neglected to pay the Mother child support for some time." Based upon our review of the record, we agree with the circuit court's conclusions with respect to the GM's factual findings.
On remand to the GM following the rejection of the original report and recommendations, there was nothing new. Although the circuit court authorized the GM to conduct further hearings on remand, the GM did not do so. Instead, he made the same recommendation based on the same findings concerning the Mother's purported "pattern" and residential instability that the circuit court had already determined did not support the recommendation.
The record reflects that the only substantial change that occurred since the entry of the final judgment of paternity was the Mother's marriage to D.M. and *756 her closely-related decision to relocate to Oklahoma. The Mother's residential and employment instability were factors that had been considered when the final judgment was entered, and the circuit court had awarded her primary residential custody despite those concerns. As noted by the court-appointed investigator, the Mother's history of residential and employment instability took on new significance when she decided to move to Oklahoma and to remove C.E.M. from the stabilizing influence of the Father and his extended family. However, as the Father's counsel conceded at the beginning of the hearing before the GM, that situation had changed and was no longer a factor in the case. Moreover, the record reflects that the Mother's residential and employment history had become more stable during the two to three years preceding the hearing.

III. CONCLUSION
For the foregoing reasons, the circuit erred in finding that a substantial change of circumstances had occurred and in changing the primary residential custody of C.E.M. from the Mother to the Father. Thus we reverse the circuit court's order of June 9, 2009. On remand, the circuit court shall enter an order disapproving the GM's amended report and recommendations. The circuit court shall also enter an order denying the Father's petition to modify the custody arrangement to designate him as the primary residential parent and to impose a child support obligation to the Mother. Furthermore, the circuit court shall enter an order restoring primary residential custody of C.E.M. to the Mother in accordance with the final judgment of paternity. Finally, the circuit court must address the Mother's request for an increase in child support and the other relief requested in her second amended supplemental petition. The circuit court may hold such hearings and take such additional evidence as may be necessary to rule on the Mother's petition.
Reversed and remanded with instructions.
WHATLEY and LaROSE, JJ., Concur.
NOTES
[1] The Father did not file an amended petition alleging a substantial change in circumstances other than the one alleged in his original counterpetition: that the Mother had remarried and wanted to move to Oklahoma. Nevertheless, the Mother did not raise any objection to the absence of a pleading alleging a substantial change in circumstances other than her marriage and planned relocation, matters which were no longer factors in the case.
[2] The record does not disclose how many of these moves occurred after the entry of the final judgment of paternity.
[3] In fact, C.E.M. had attended the same school since leaving kindergarten.